The next case on our calendar is Y.F. v. New York City Department of Education. Morning. Morning, Your Honor. Lawrence Weinberg for Plaintiff Appellant Y.F., the parent of K.H. This case involves a 19-year-old young woman. That involves her... She was 14 at the time. She was 14 at the time. She was 14 turning 15 at the time during the 2012-2013 school year. And an IEP was prepared. She has an intellectual disability at the time. She was functioning on a second-grade level. In both reading and math. However, there was a consensus in both her then-school Department of Education and the parent that she could move forward to a career as a veterinary technician. And the IEP was created with that in mind. And there were a lot of pieces of the IEP. The inferential thinking... Counsel, you have conceded that the IEP is acceptable. Correct. And the IEP was created... The primary issue that the parent had was that the ratio was a 12-to-1-to-1. Twelve students, one teacher, and one paraprofessional. Whereas the program at Cook was 12 students and two teachers. That was the primary dispute in terms of the IEP. Between the placement? Between the city's placement and their private placement? No, between the IEP and the... Oh. That was the primary issue on the IEP. The hearing officer found against the parent on that issue, and the parent did not appeal that issue. Right. However, there were serious deficiencies in the placement of the McSweeney School, which is the P721X, its ability to implement the IEP. And because the child was entering high school and was going to be a veterinary technician, that was the long-term goal, these deficiencies created a situation where she could not receive meaningful benefits. And the parent testified about her impressions, and obviously a parent doesn't have the... doesn't understand every educational issue. And the parent also put on a witness, Ms. Ord, who worked for... Before we get to Ms. Ord, though, I encountered in the briefing a long list that seems somewhat variable about the ways in which... about the aspects of the IEP that your client was claiming McSweeney couldn't provide. Could you just highlight, like, the five most focused items that she had some evidence that McSweeney was just unable to provide at all? Well, probably number one would be the science... That there was no science curriculum. Correct, because the long-term goal of veterinary technician would have been impossible without a science curriculum. Did the IEP call for her to have a robust science curriculum? The IEP was silent about science, but had the long-term goal of the... The veterinary tech. So what evidence do you have that to be a veterinary technician you would need a science curriculum, and what sort of science curriculum is inherently required for that career aspiration? There wasn't particular testimony about the nexus between... Well, but that's puzzling then. So how can you say that the absence of a specific science curriculum... But that there is no coherent curriculum or specific program on science? If the disparity between that defect and the IEP hinges on not something specific in the IEP requiring science, but this career aspiration, wouldn't there have to be some evidence that there is a nexus? I mean, I don't know what being a veterinary technician implies. It could be quite a lot of things. It could be comforting the animals, or it could be operating X-ray machines. I don't know. So what is it about what this young woman aspires to or what the IEP says she should be prepared for and an unspecified science curriculum? It's unclear from their... There was no testimony in their curriculum about the exact nexus between science... But isn't that a problem for you? That is a problem, but that is not the only issue. Judge Carney asked you to give me your five best, and you led with this one. So, okay, if that's not so good, what's the next best one? Social skills. And the IEP specifically states that she needs social skills training, and Ms. Ord testified that there was no... But for Ms. Ord, because Ms. Ord is a whole separate issue, but what evidence is there that... And what did your client take into account in declining the McSweeney placement and concluding that McSweeney could not and would not fulfill the IEP's requirement that she work on social skills? I mean, that also seems very vague to me, and just being in a social environment with the supervision suggests to me you're working on social skills. Was there a particular program that the IEP called for that McSweeney never provides and is not capable of providing? The IEP specifically called for social skills training. And what evidence was there that McSweeney doesn't provide any social skills training? And that was the testimony of Ms. Ord. So, again, that came later. Correct. I mean, the parents' primary concern... The parents had two concerns. One was this issue in terms of the way things were locked in the bathrooms and having to go to the bathroom with a paraprofessional, and then also what she was unable to see. But under MO, you have to show that the placement was incapable of, kind of facially incapable of satisfying the IEP and having agreed on the IEP to get anywhere here, as I understand it. Yes, and that is the testimony of Ms. Ord, which is the demonstration of that. The parents' testimony alone was examined by the hearing officer and by the SRO, and both of them found that their testimony alone was unable to demonstrate that the school was able to. However, no one really looked at Ms. Ord's testimony other than the way that the SRO looked at it in this kind of offhanded way. My understanding was, though, that the testimony of Ms. Ord didn't bear on your client's decision not to accept McSweeney, and therefore it was rejected as useful in making the determination whether the decision was correct or not, or defensible. So you're saying that that was wrong, that your client should have the opportunity to adduce whatever kind of evidence she wants after making her decision about the capabilities of the placement to satisfy the IEP. Is that right? Well, MO held that it's the court is evaluating whether at the time the parent was considering the school could offer the services. And it's not whether the parent knew, because if the school is unable to meet a mandate and the parent is unable to discern that on the visit, then the parent isn't precluded from later arguing. You can make a bet saying, I don't think so, and go and decline the placement and later look for evidence about whether the school could satisfy the IEP. Is that what you're saying? Correct. And if the parent later finds that witness, in this case Ms. Ord, then the district can't say, well, Ms. Ord wasn't part of your thinking process. But isn't there a separate problem? We successfully hid this from you. Isn't there a separate issue with Ms. Ord? In other words, I take your point that it seems a little bit odd to say that if the parent makes the right bet, as it were, that still there is, you know, that in fact the placement was inappropriate or couldn't implement the IEP, and in fact the parent thought that at the time, but she didn't have the goods on them at that moment. That seems a little unfair. But still, with Ms. Ord's testimony, is she talking about the program for the school year that we're addressing, or is she saying, well, in the past I've seen these problems at McSweeny? I mean, that seems to me to be the relevance of the at the time the decision is made. This is a difficult test to meet because we're looking to the future. So if somebody comes in and says, I didn't see this kind of program last year when I was there, or I didn't see these programs on past visits two years ago, how does that project forward? If the district had put on a witness that said we understand, you know, if the district, after hearing Ms. Ord's testimony, put on a witness that said, yes, Ms. Ord is correct, when she visited in 2011-12 the district did not have these features. However, we have met together, and we now have these features that we are implementing in 2012, then the parent would lose. But the district did not put on a witness. So all we have is Ms. Ord's testimony that she has visited the school several times and has never seen these various aspects of the program that are found on the IEP, the social skills. And what specifically about social skills does the IEP require? The testimony, it's a recommended improvement in social emotional functioning and social skills training. It's at the confidential appendix, pages 132-136 and 138. Is that some kind of term of art? Because I would think that almost anything that goes on in the school involves social skills, that, you know, just, sorry, you have to raise your hand before you talk. Don't, you know, pull the other kid's pigtail. All this stuff is about social skills. So is there some particular kind of specialized training that the IEP requires that's distinct from what is, you know, intrinsic to the – because it strikes me as incredible on its face that you could visit a school, unless the school were a horror show of some kind, that there's no social skills training that goes on there. When a student is typically developing, what happens in the classroom in terms of learn to raise your hand, weight and turn taking, it happens organically. And a typically developing student acquires their social skills organically and doesn't need a specific focus on social skills. However, when a child has a learning disability, and in this case it's an intellectual disability, and so she was on a second grade level when she was 14 turning 15, she needed that specific training because she couldn't internalize that. I grasp that distinction, but in terms of what the IEP requires, is it explicit that this social skills training has to take place outside that regular context? And what is the nature of the training? Yeah, and what is the nature of the training? Because it seems to me it's sad that a child of 15 is having difficulty assimilating stuff that some other child might have gotten in a second grade classroom, but if the classroom is functioning like a second grade classroom and addressing the kind of issues that are typically addressed in a second grade classroom, then I'm not sure, you know, and maybe it would be right that I'm totally off base that in order to deal with this particular disability, you need separate distinctive social skills training in some separate place with some separate kind of professional as a class in social skills. So all I'm asking is, does the IEP say that's what we need, or does the IEP just say, as many IEPs I've seen have said, the teachers have to work on this. This is something that is part of what you need to address with this child. At C-148, it specifically states in the program. This is the IEP? That's in the IEP. Go on. C-148. It says specifically under counseling instruction in social skills training, and part of the testimony was Ms. Zord that she had never seen social skills training at McSweeney. I'm sorry. I'm looking at 148, and I see instruction, and she needs to get instruction in executive functioning skills, instruction within a small group, participation in work-study, instruction in travel readiness, instruction in activities of daily living. Where am I? Under related services, participation in small group. It says instruction in social skills training. And so Ms. Zord testified that she, on various visits to McSweeney, had never seen instruction in social skills training taking place. Correct. And is there any reason to think that she knows everything that's happening at McSweeney? Well, one of the things that was most disturbing about the SRO's decision in that footnote 17 was the SRO says that Ms. Zord's testimony had two. One were sort of conclusions that the child would regress, and the others were things that she had never seen. And then the SRO states that Ms. Zord testified that she was often obstructed from viewing the program at McSweeney, and so he then discounted her testimony because she was unable to see. However, Ms. Zord was always going there with a parent, and there was a procedural denial here. There's a procedural problem where the parent has the right to view the school and to learn information about the school. And so to say that various parents are being obstructed from seeing the program and we're now not going to let a witness testify because they didn't see the program, at the same time the district isn't putting on a witness to say that the program exists. So we're just now in a situation where the parent is unable to see it, can't testify that they can't see it, they're not putting on a witness to say that it exists, and we're just supposed to believe that it's there. And that is not what MO said. MO said that you couldn't attack the IEP through placement. You can't say, oh, we're not being functionally grouped, we don't like the curriculum. But MO didn't say that we're going to assume that every aspect of the IEP is there. And the question is, does it have the capacity to implement it? It doesn't suggest really that we do assume that the placement is able to fulfill the IEP in the absence of at least some prima facie showing to the contrary, which point the burden might shift potentially to the city to demonstrate that, in fact, it can fulfill the IEP. Well, I think that there are two issues here. One is the IDA and whether Ms. Ord's testimony made a prima facie case that it wasn't there. And then that would then shift the burden. But then there's also the question under New York State law and whether the district, because under New York State law, the district has the prima facie burden. And in MO, the court held that because the parents' complaints were related to the IEP, related to the functional grouping, and related to the methodology, and not really related to the capacity to implement, that the district had no burden to put on testimony. MO didn't really take away that burden that the district has under New York law, but it said that in that case, because of the nature of the arguments the parents were making, were really arguments about the IEP, that it was okay that the district didn't put on a witness. Here, the parents pled. I mean, if you look at the hearing request, I think it's OCA-128 is where it begins. I mean, there are all sorts of pleadings about the placement. And so there are pleadings about the placement. There's testimony about the placement from the parent, which the parent testimony is more, it doesn't get to that capacity to implement. It's Ms. Ord's. And then you have all of Ms. Ord's testimony about the capacity to implement. And then to say that, well, there is no, we're going to assume, then it's just the district can put anything in an IEP. We'll have to stop here. You've long expired. Although you have two minutes for rebuttal, we'll hear from the district. May it please the Court. I'm Jonathan Poplow for the Department of Education. The only issue before the Court is whether the IEP as written was capable of being implemented by the placement school. And the starting point for analyzing that is what did the IEP actually require. And the problem that I think has been identified already in this argument is that there's just this vague statement that the IEP couldn't have achieved certain goals. There's no real delineation of what specifically mandated by the IEP could not be. Well, let's talk about the social skills, which we were just talking about. The IEP required training in social skills. It didn't require. I'm looking for what it required. Go ahead. It didn't require a particular methodology. And that was one of their main objections at the beginning of this case, that the insurer and the parent felt that they didn't employ the same teaching methodologies that Cook did, that they felt would be better served, that KH would be better served by that. But the IEP does not require a specific methodology, and that applies to teaching social skills as well. Except there's an argument here. It's with the substance of the IEP itself, which they have conceded was adequate. The IEP says, Participation in small group activities to develop and practice social interaction with peers and familiar and unfamiliar adults. So when Ms. Ord went there, she didn't see any of this. That's the point, even as nebulous as this language is. But there's still, it's still a, even if you accept that premise, it's still a prediction that something's not going to happen in the future. There's no clear facial deficiency as there was in the case of the group. She didn't see any small group activities. Do you concede that? Isn't that what her testimony is? I concede that that's her testimony, yes. She didn't observe small group activities. That doesn't necessarily mean. There was a 12 to 1 to 1 ratio, which included a paraprofessional. Part of their criticism is actually a different one that sort of refutes this to a certain extent. They were concerned when they broke into small groups that a paraprofessional, who's not a certified teacher, would be teaching those small subgroups of 12. Subgroups of 12, meaning six or so. Probably they'd split it six and six. So what kind of small groups are we not getting if the class that starts with 12 students and two teachers is broken up into subgroups? How can it be the case that there are no small groups? Exactly. Okay. Or is there, I'll have to ask him how small the groups have to be. But could I go to, there may be substantive deficiencies in Ms. Ord's testimony, and some of those are referred to in footnote 17. But the state review officer says because the parent could not have relied on the information presented by Ord in making the decision, the testimony of Ord could not have factored into the parent's decision, and therefore I declined to consider the testimony. What is the legal basis for saying that if the, and this is somewhat hypothetical because it disregards the substantive criticisms of Ord's testimony, but assuming that Ord's testimony persuasively demonstrated that McSweeny fails to measure up to the IEP, what would be the basis for saying I disregard that testimony because the parent did not know that? I mean, is this about punishing the parent for making a bad faith decision, or is this about is the school adequate to do the IEP or not? I think it's about taking into account the fact that the appropriateness of a proposed placement is supposed to be evaluated as of the time of the placement. It's supposed to be able to kind of go back and kind of come up with every potential theoretical hypothetical reason why perhaps they could not have implemented it. The pertinent question here is did they have the capacity to implement it? And just to quote a line from the district court decision that I think accurately reflects the state of the law, in cases that have found the placement was inappropriate, the inability of the proposed school to provide a free, appropriate public education defined by the IEP was clear at the time the parents rejected the placement. So I think that's part of the answer. Another point worth noting is that the district court, in affirming and looking at the record and affirming the state review officer, assumed that Ord's testimony should have been taken into account and took it into account. Okay. So you're not defending the argument that Ord's testimony or relying on the argument that Ord's testimony is irrelevant? Not exclusively. Okay. But you did seem to take the position that prospective challenges are inappropriate as a matter of course for a parent. And that seemed to me not to ‑‑ I mean MO really went off on a different basis for decision, but we have suggested strongly then that a parent still is entitled to challenge a particular placement for incapacity to provide or to satisfy the IEP. So who has the burden of going forward? How do we implement that notion? I think this, both the hearing took place and the SRO decision were before they had the benefit of MO's decision. I mean the court took that into account in MO and in other cases, recognizing that sort of the lay of the land has changed a little bit. But MO was clear that any sort of obligation to come forward with evidence about proposed placement schools, the ability to implement the IEP is only in response to permissible prospective challenge. It has to be, and MO was pretty clear that it dialed back, it didn't really undercut RE at all. It just said that there's no requirement that you have to send your child to a facially deficient school prior to bringing a challenge. But the only challenges to date that the court has approved as permissibly prospective were where it was obvious, facially obvious at the time the decision was made that the school could not have implemented the IEP. So does the parent have the right to have access to the school to kind of look around and say, well, hey, there's no math teacher, but my IEP says we've got to do math? They don't. I think under the court's precedence in one of the, I'm blanking, I think it's one of the T cases, I can't remember the second initial, it said that you don't have a right to a particular bricks and mortar school. So I think it- No, I know that, but still to assess, I mean, you offer us a placement, and how is the parent, the parent may look at the placement and say, I've heard on the street that there's no math teacher here, but we have math goals. What happens next? I mean, does the city ultimately have a burden of demonstrating that the placement is capable of satisfying the IEP? In BP, which was a summary order that sort of interpreted that aspect of MO, the court did say that when confronted with a permissible prospective challenge, that there is an obligation to adduce evidence of the ability of the school to implement the IEP. But that's not the case here, because this has also been- Well, then just kind of peddling back, what access does a parent have to assessing the capacity of the proposed placement to satisfy the IEP? See, I'm not positive that the court's precedents have established a definitive right to visit a proposed placement school. It's a matter of course that they are offered that opportunity, and they certainly availed themselves of that opportunity. And the parent here did avail herself of that opportunity. They did. And most, if you look at the initial due process complaint and also the parent's letter declining the placement, it all had to do with her sense that it was inappropriate for her daughter, that it had a prison-like feel, that they didn't observe any girls, that they had to get a teacher to unlock the bathroom. So how strong, in your view, is this requirement of incapacity to implement? If the school is just a lousy school and they do a terrible job of implementing IEPs, is that not enough because they're capable of doing it? And if they're sort of sluggardly, that's not showing there is an absolute impossibility that they'll come through in this particular instance? I think so, because there's this distinction between capacity and a prediction that it won't happen. I think you need to police that boundary with some vigor, or else you really are sort of undercutting what has been said in RE, that you have to evaluate an IEP prospectively. And I think what you have here is, in some sense, an attempt to kind of reverse manufacture a claim because they've conceded the IEP was substantively adequate. So if they've conceded that, but yet the deficiencies that they point to in McSweeney's ability to implement go to what they hoped was in the IEP, not what's actually in the IEP. And that's sort of what I wanted to start with. You can't challenge a placement school capacity to provide services that aren't mandated by the IEP. You have to look to the IEP first and say, what specifically is mandated in the IEP that you cannot provide? So to go back to Ms. Ord's testimony and the social skills, let's take it for the moment as credible that in these previous visits, the witness never saw any social skills instruction. Now we've got an IEP that says give social skills instruction. In small groups. Would you say that the testimony is still irrelevant, not because the parent didn't know about it, but because it doesn't show they can't do that? They've got the personnel. They've got the staff. They can do this if they're instructed to do it by the IEP. And so the fact that they haven't done it ever in the past, the fact that no one's ever seen it happen is just not reasonable evidence to project going forward. It's that it's not on point because the question is capacity to do it, not have they done it, will they do it, are they good at it. Is that the position? Correct. And also it's worth noting that small group I think has to be read in context of an IEP where a 12 to 1 to 1 ratio was approved. They didn't want that ratio, but they lost on that issue. And they've said that the IEP is substantively adequate. And they also complained in the due process complaint, they lost on this issue as well, that there was no opportunity for one to one instruction. So, again, this goes back to the substantive adequacy of the IEP, which is not an issue now. And they can't challenge that back door through bringing the capacity. Your time has expired. Thank you, council. Mr. Weinberg, you have reserved two minutes for rebuttal. I wanted to go to BP, which opposing council mentioned. I think BP set forth a good standard where it said that you first look at the pleading, and here the pleading is on CA-128-129 where the parent pleads on placement. And there are certainly issues there that would be precluded by MO, such as the no opportunity for one to one instruction. That is obviously a complaint against the IEP. However, there are other complaints, particularly the fact that it's pledged generally that the placement cannot implement the IEP, including but not limited to the academic management needs, social-emotional management needs, physical management needs, behavioral needs, and the related services. There's also a place where it says that there is no differentiated instruction. Any place where the IEP refers to individualized instruction, that would demonstrate that the school is not meeting the needs of the IEP. Could you go back to Mr. Popolo's argument as he confirmed to me he was making it? None of this says they weren't capable of doing that. If they've got enough staff to provide occasional one-to-one instruction or they've got enough staff to break into small groups of six, you're saying six is too big a group to qualify as small groups, or is that part of the argument? I mean, if they've got the staff to do it, they're capable of implementing the IEP. Is the fact that, you know, it strikes me as a peculiar position, but if the standard is incapacity, maybe it shouldn't be, maybe it isn't, how does the fact that they've been a failure at this in the past necessarily say, or they just haven't implemented it, we've never seen this done? If they're told, you know, do, it's not in the IEP, but suppose the student wants to be a veterinary technician, you have to give her some exposure to animals. And the witness says, you know, I've been there a million times. None of the classrooms have animals. Does that mean that they're incapable of fulfilling the IEP because they could buy a cat or a hamster or a fish? You see what I'm saying? There's a difference between how good they are at things and how good we expect them to be at things and do they have the capacity, if told, do X to do X. And I think there are two pieces there, and I think the first piece is the lack of a district witness because a district witness could have stated we have the capacity to do that. But we know they have the capacity for certain things. I mean, we know what the staff ratio is in this class. We don't know if they have the capacity to teach social skills training because we don't know if they have a social skills curriculum. And Ms. Ord never saw a social skills curriculum. So it's your argument that they were bound to put on a witness? Under New York state law, which puts the burden on the district, and under BP when the parent pleads the incapacity to implement, then the district would have to put on a witness, and the district did not have to in MO because the complaints with regard to functional grouping and methodology were complaints with the IEP, not the school. And so it wasn't that the school didn't have to because they don't have to in general, but it's because the complaints were attacks on the IEP. Here the parent isn't attacking the IEP. They're attacking the capacity to implement. And then the second piece is in the seafood case, which was D.C., the school tried to argue that, well, if we came here, we would make it a seafood-free environment. But when the parents visited, it didn't have a seafood-free environment. So the question is, do they have it, not would they suddenly get it? And so the fact that they're saying, oh, well, if you had come here, well, we would have run down the street and had a social skills curriculum and a science, it's like, do they have it? Did they have a plan to implement a science curriculum? In D.C., I think, that had the school, if the school had a plan that they were going to, okay, we've served seafood in the past, but in the future we are getting rid of all seafood and that they have this as part of their five-year plan that, you know, the schools in it, that one school every 20 is going to be seafood-free and another is going to be peanut-free and this was going to be the seafood-free school, the fact that they hadn't, well, then that might not have been held against the district. But the fact that they're saying, oh, well, we have the capacity to stop serving seafood, but when the parents visited, they were serving seafood. Here when Ms. Zord visited and the parents visited, they didn't have a science curriculum. They didn't have a social skills curriculum. Ms. Zord said she didn't have travel training. There's a document that says they did have travel training. So there's a conflict there. But there is a lot of testimony that the school didn't have these things and it's the fact that they may have suddenly had them. I don't think that there is this sort of trust. I think that you have a district witness testify. Ms. Zord is wrong. We have a social skills curriculum. Ms. Zord is wrong. We have travel training. But to just say, well, we're just going to completely ignore Ms. Zord's testimony, which is what the IHO and the SRO did, is wrong as a matter of law. Thank you. Thank you, Your Honor. Thank you both. Very good argument. We will reserve decision. The next case on our calendar is on submission. So I will ask the clerk to adjourn court. Court is adjourned.